No. 90-354

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

FILED

JUL 30 1991

_____ Smith
SUPREME COURT
OF MONTANA

IN THE MATTER OF R.H.,
A YOUTH IN NEED OF CARE.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade,
                The Honorable Joel G. Roth, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Patrick R. Watt, Jardine, Stephenson,
            Blewett & Weaver, Great Falls, Montana

        For Respondent:

            Honorable Marc Racicot, Attorney General, Helena,
            Montana; Kathy Seeley, Assistant Attorney General,
            Helena, Montana; Patrick L. Paul, Cascade County
            Attorney, Great Falls, Montana; Tammy Plubell,
            Deputy County Attorney, Great Falls, Montana
            (Montana Department of Family Services);
            John Keith, Attorney at Law, Great Falls,
            Montana (R.H.)


                        Submitted on Briefs:  May 10, 1991

                                  Decided:  July 30, 1991

Filed:


                    _____
                              Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

The natural parents of R.H., a youth in need of care, appeal from an order of the Eighth Judicial District Court, Cascade County, terminating their parental rights. We affirm.

The following issues are raised on appeal:

1. Did the District Court err in finding that the court-ordered treatment plan was appropriate?

2. Was the court-ordered treatment plan ambiguous so as to deny the parents due process?

The natural parents had four children: L.H., J.H., R.H., and V.H. The oldest child, L.H., began to live with her paternal grandmother in the mid-1970s. In 1975, the second child, J.H., was placed in foster care. Five years later, the parents voluntarily relinquished custody of J.H. to the State.

On April 28, 1986, the State first became directly involved with R.H. At that time, it petitioned for temporary investigative authority and custody of R.H. and his brother, V.H. The affidavit in support of the petition outlined severe developmental delays of V.H. caused by lack of stimulation by the parents, R.H.'s withdrawn behavior, and apparent physical neglect of both children.

Following a hearing, the District Court ordered the parents to undergo psychological evaluations. The evaluations, prepared by Dr. Monty Kuka, Ph.D., a clinical psychologist, were admitted at the show cause hearing on the petition.

In the evaluations, Dr. Kuka found that both parents had borderline intellectual abilities. Dr. Kuka's assessment of the

2

mother's parenting skills resulted in a fairly bleak picture. The doctor found that she had limited insight into herself and her relationships and that she did not recognize even the most obvious characteristics of being a good mother. He was pessimistic about her ability to benefit from supportive services, as well as her ability to make any long-term changes.

Dr. Kuka found that the father's overall adjustment was fairly good; he appeared kind and sensitive to his wife and children. Dr. Kuka concluded, however, that it was doubtful that the father could offset the significant negative factors exhibited by the mother because the father was not assertive and put the mother's needs before those of the children.

The show cause hearing was held on July 25, 1986. Following the hearing, the District Court ordered that the State maintain temporary legal custody of V.H. and R.H., with V.H. residing with an aunt and uncle, and R.H. residing with his parents. The court further ordered the mother to attend New Directions classes and the father to attend counseling with R.H. as needed.

Shortly after the hearing, the parents and R.H. moved to Washington. This move was prompted by the mother's desire to avoid the pressures she felt from her family, who resided in Montana, and by the father's desire to live closer to his father, who resided in Washington. In November 1986, after her grandmother's death, L.H. joined her parents in Washington.

While the family lived in Washington, a social worker and a teacher reported suspected abuse of the children to Montana

3

authorities. In March 1987, when the family returned to Great Falls to pick up some stored items, L.H. called the Crisis Line and asked to be removed from the parents' home. R.H. and L.H. told social workers that the mother used a leather belt to spank R.H. on the face, legs, and buttocks. She threatened L.H. with a knife and held a knife against R.H.'s throat. Frequently, there was not enough to eat in the house, and L.H. often had to babysit R.H. in the evening while the mother worked.

The State petitioned for temporary custody of L.H. and permanent custody of V.H. and R.H. At the custody hearing, the parties stipulated and the court ordered the termination of the parental rights to L.H. and V.H. The State was granted permanent custody of L.H. and the aunt and uncle were granted permanent custody of V.H. The court also ordered that the State maintain temporary custody of R.H., who would be placed in the foster home where J.H. had been living for several years. In addition, the court directed the parents to attend and successfully complete parenting classes. They were also ordered to undergo psychological evaluations and to follow through with all recommendations made in those evaluations. The order provided for future review to determine whether the parents were able to resume custody of R.H.

In March 1988, counsel for the State, counsel for the parents, and counsel for R.H. entered into another stipulation, which was adopted by the District Court. The stipulation left temporary custody of R.H. with the State and established a new treatment plan for the parents. The treatment plan required the parents to

4

provide the State with written reports about their progress in parenting classes. It also required the parents to begin psychological counseling immediately, to disclose the name of the therapist to the State, and to provide the State with progress reports from the therapist.

For one and one-half years, the mother attended parenting classes in Washington. The father attended the classes for one year. The parents also sought family counseling but learned that such counseling was of little use without R.H.'s participation. They did not obtain individual therapy. However, they underwent psychological evaluations.

From June 1987 to September 1988, the parents did not contact R.H. In September 1988, the social worker in charge of the case initiated a visit between R.H. and the parents. All appeared happy to see each other during the meeting, which lasted about 2 hours and 15 minutes. R.H. seemed to have a warm relationship with the father, but interacted only slightly with the mother. After the visit, R.H. was anxious and more disruptive at home and school.

A second visit took place later that month, during which R.H. spent the night with the parents. After the visit, R.H.'s behavior deteriorated dramatically. He became very hostile and confused. He began wetting and messing his bed. He cut hunks out of his hair. He refused to shower or wear clean clothes. His grades dropped from As and Bs to Ds and Fs. His behavior gradually stabilized until January, when he received a Christmas card and gift from his parents. He began acting out again.

5

R.H. was evaluated by Dr. Edward Trontel, Ph.D., a clinical psychologist, on February 7, 1989. Dr. Trontel found that R.H. was very depressed. The doctor also found that R.H. had great difficulty with mother figures. The doctor concluded that R.H. had difficulty paying attention in school because he was so worried about the possibility he would be returned to his parents. R.H. told him that, although he wished to be with his parents, he was terribly frightened of his mother and was afraid she might kill him if he said the wrong thing. He believed his father could not protect him from her. In Dr. Trontel's opinion, even under the circumstances of this case, the mother's threats and lack of empathy for R.H. were unusual.

On July 13, 1989, the State petitioned for permanent legal custody of R.H. and termination of parental rights. Three hearings were held on the matter. Dr. Trontel testified regarding his evaluation of R.H. Dr. Kuka testified concerning his 1986 evaluations of the parents. He compared his evaluations with those completed by Dr. Panek in Washington in 1988. Dr. Kuka stated that Dr. Panek's findings were even more negative and extreme than his own two years earlier. The doctor concluded that there was not any realistic hope that the parents would develop the kind of dramatic changes needed at this point to be able to parent effectively.

R.H. did not testify at any of the hearings, but was interviewed in chambers by the District Court. R.H., then 12 years old, told the judge he enjoyed living with his foster family, he was afraid of his mother because quite often she would strike him

with a leather belt, and, although he did not mind visiting his parents, he did not wish to live with them.

The parents testified at the hearing that they were adequate parents and, while they had attempted to comply with the treatment plan, they did not believe they truly needed to do the things the State told them to do.

Following the hearing, the District Court issued findings of fact, conclusions of law, and an order terminating the parental rights of the parents and awarding permanent custody, with right to consent to adoption, to the State. The parents appeal.

The statute for terminating parental rights provides in pertinent part:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that the circumstances contained in subsection . . . 1(c), as follows, exist:
>
> . . . .
>
> (c) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. (Emphasis added.)

Section 41-3-609, MCA.

The parents argue that the State failed to meet its burden of proof because it neglected to show that the court-ordered treatment plan was appropriate. The State counters that it was not required

7

to prove that the plan was appropriate because the parents, through counsel, stipulated to the plan.

The termination of parental rights implicates fundamental liberty interests. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Therefore, the State bears the burden of proving by clear and convincing evidence all of the statutory criteria needed to terminate parental rights, including the appropriateness of the treatment plan. Santosky, 455 U.S. at 769, 102 S.Ct. at 1403, 71 L.Ed.2d at 616; In re L.W.K., 236 Mont. 14, 18, 767 P.2d 1338, 1341 (1989). The fact that the parents, while represented by counsel, stipulated to the plan adds some weight to the inquiry. However, that fact does not in and of itself prove that the plan was appropriate.

The parents claim that the plan was deficient because the State's witness, Dr. Kuka, testified that the parents needed to attend parenting classes, psychotherapy sessions, and group therapy meetings in order to develop insights into themselves and improve their parenting skills. The parents point out that the treatment plan contained only two of the three components cited by Dr. Kuka as necessary for successful treatment: parenting classes and individual psychotherapy sessions.

Although the plan did not possess every element that Dr. Kuka believed was important for treatment, we hold that, under the facts of this case, it was not inappropriate. Dr. Kuka stressed that the most significant component was psychotherapy, while parenting classes and group therapy were secondary considerations. Because

8

the treatment plan contained the most important element, as well as one of the others, the plan was appropriate.

Furthermore, the parents do not argue that the parenting and psychotherapy elements that comprised the treatment plan were inappropriate, only that the plan was deficient. We note, however, that the parents neglected to comply with the parts of the program that were admittedly appropriate. We fail to see how adding a third requirement, group therapy, would have spurred them on to comply with the most important element of the program, individual therapy.

Substantial credible evidence supports the District Court finding that the treatment plan was appropriate. The District Court did not err in making the finding.

The parents next contend that they were denied due process because the treatment plan was ambiguous. We do not agree.

The final treatment plan was the third version attempted with the parents. The stipulation adopting the plan states in pertinent part as follows:

> 1.   On May 5, 1987, the above parties [the State and the parents] stipulated to the following arrangement for [R.H.]:
>
> . . . .
>
> d)   [The parents] would attend and successfully complete parenting classes.
>
> e)   [The parents] would undergo psychological counseling.
>
> . . . .

4. At the time set for hearing [the State] had not received any written reports concerning parenting classes or counseling.

The above-referenced parties now stipulate to the following disposition of the case:

. . . .

2. [The parents] must take the necessary steps to see that [the State] receive[s] written reports about their progress in parenting classes. [The State] must receive the reports by June 15, 1988.

3. [The parents] must take the necessary steps to see that [the State] receive[s] a progress report from their therapist in Washington. [The State] must receive the report by June 15, 1988. [The parents] must also disclose the name of their therapist to [the State] by May 15, 1988.

4. If [the parents] have not been undergoing psychological counseling they must do so immediately and must disclose the name of their therapist to [the State] by May 15, 1988.

5. [The State] will petition the Court for the appropriate relief after it receives the above information from [the parents]. In the event [the State] do[es] not receive the requested information by June 15, 1988, [the State] will request the Court to set a final dispositional hearing and will proceed without the requested information. (Emphasis added.)

The treatment plan was not ambiguous. A plain reading of the plan establishes that the parents were required to attend parenting classes and receive psychological counseling. In fact, paragraph 4 of the plan emphasizes the importance of the psychotherapy requirement by directing the parents to obtain counseling immediately.

The problems concerning ambiguity arose when the parents began to hedge the plan. Rather than follow the clear terms of the plan, the parents' attorney contacted the social worker in charge of the

10

case to see if the parenting classes fulfilled the counseling component. The social worker indicated that the parenting classes essentially fulfilled this condition.

Although the State may assist the parents in completing the treatment program, the parents retain the ultimate responsibility for complying with the plan. L.W.K., 236 Mont. at 19, 767 P.2d at 1342. In this case, even though the final program mandated individual psychotherapy, the parents attempted to find ways to bypass the requirement. Indeed, the conversation with the social worker may well have muddied the terms of the plan. However, the parents themselves invited the ambiguity by refusing to follow the plain requirements of the program. They cannot now claim that they were denied due process.

Affirmed.

_William E. Hunt, Sr._
Justice

We concur:

_Karla M. Gray_

_John Conway Harrison_

_J.C. McDonough_

_Jim Tnuicl_
Justices

11