No. 99-307

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 315N

IN THE MATTER OF THE CUSTODY

AND THE PARENTAL RIGHTS OF

M.D.,

A Youth in Need of Care.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Peter Bovingdon, Assistant Public Defender, Lewis and Clark County, Helena, Montana

For the Child:

Randi M. Hood, Chief Public Defender, Lewis and Clark County, Helena, Montana (child)

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Mark W. Mattioli, Assistant Attorney General, Helena, Montana; Mike McGrath, Lewis and Clark County Attorney, Carolyn Clemens, Deputy Lewis and Clark County Attorney, Helena, Montana

---

Submitted on Briefs: October 14, 1999

Decided: December 14, 1999

Filed:

---

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

1. ¶ Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of non-citable cases issued by this Court.

2. ¶ Sabrina M., the biological mother of M.D., appeals from the Findings of Fact, Conclusions of Law and Order entered by the First Judicial District Court, Lewis and Clark County, terminating her parental rights to M.D., and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (hereinafter, Department). We affirm.

3. ¶ Sabrina raises one issue on appeal, which we restate as follows:

Did the District Court err in terminating Sabrina M.'s parental rights to M.D. due to a lack of clear and convincing evidence?

## Factual and Procedural Background

4. ¶ Sabrina M. and Kenneth D. are the biological parents of M.D. Sabrina gave birth to M.D. on January 28, 1997, approximately two months premature. At that time, Sabrina tested positive for marijuana, which she admitted using several weeks prior to giving birth to M.D.

5. ¶ Due in part to concerns expressed by Sabrina's treating physician, the Department on February 3, 1997, filed a petition for temporary investigative authority, protective services and temporary custody, and for adjudication of M.D. as a youth in need of care. The petition was based upon evidence that not only had Sabrina admitted to smoking marijuana and using other drugs during her pregnancy, she did not have a reliable source of income, she did not have an established residence, and she and Kenneth had a history of substance abuse.

6. ¶ In March of 1997, Sabrina and Kenneth--both represented by counsel--stipulated to M.D.'s status as a youth in need of care and to the court granting the Department temporary custody of M.D. for six months. Sabrina voluntarily placed M.D. in her aunt's care during this time. In June of 1997, Sabrina began her treatment plan, which she had signed and the court had approved. The stated goals of the plan were for Sabrina to learn and use skills needed to parent M.D. and provide a safe, stable environment, as well as remain drug and alcohol free. The treatment plan required Sabrina to:

(1) obtain a chemical dependency evaluation and follow all recommendations of the evaluation;

(2) participate in parenting classes, complete the classes successfully, and provide a letter of recommendation from the instructor stating successful completion;

(3) abstain from the use of alcohol or illegal drugs, and avoid association with people who abuse alcohol or use illegal drugs;

(4) submit to random urinalysis, breathalyser, or blood testing with the condition

that failure to report for such testing carried a presumption of use;

(5) not possess on her person or in her home alcohol or illegal drugs;

(6) sign releases of information between all professional parties for effective communication.

7. ¶ M.D. was returned to Sabrina's care in late July of 1997. By late August of 1997, M.D. dropped from the 50th percentile in birth weight to below the 5th percentile. M.D.'s treating physician admitted M.D. to the hospital for "failure to thrive," and M.D. subsequently gained weight without difficulty. Sabrina received instructions on how to properly feed M.D. at this time after her physician learned that M.D. had been fed "ground up table food."

8. ¶ Following a review hearing on October 31, 1997, the District Court again found M. D. to be a youth in need of care, and extended temporary custody and Sabrina's treatment plan for an additional 90 days. In December, M.D. was again returned to Sabrina's aunt's care because Sabrina was in jail and the father, Kenneth, did not want to care for the child. Shortly after her release from jail, Sabrina tested positive again for marijuana, in the first of a series of random drug tests pursuant to the treatment plan. She would again test positive on January 14, 1998, January 22, 1998, January 30, 1998, and on March 18, 1998.

9. ¶ Following a review hearing in March of 1998, the Department petitioned for termination of parental rights in June of 1998. The hearing on this petition, scheduled for September 18, 1998, was vacated, however, due to an apparent improvement by Sabrina in following her treatment plan. Sabrina had moved into a women's shelter in Billings, had apparently severed ties with M.D.'s father, and had gained steady employment. She tested positive for marijuana, however, in July 1998. The parties agreed that the treatment plan would be extended for an additional six months.

10. ¶ For a brief time, in October of 1998, M.D. was returned to Sabrina's care following a clean drug test. Sabrina's Department case worker characterized this as "one more try to see if she can pull this off." However, by November of that year, the Department amended its petition for termination of parental rights after Sabrina missed a prearranged urinalysis test appointment on November 6, and then later "maxed out" a test for methamphetamine on November 9. At this time, Sabrina also conceded that she had again become involved with Kenneth, M.D.'s father. M.D. was then returned to foster care with Sabrina's aunt for a third time.

11. ¶ The hearing on the petition for termination of parental rights took place on January 8, 1999. At that time, Kenneth legally relinquished his parental rights. Testimony indicated that although Sabrina was successful in complying with the parenting classes requirement, she had failed numerous drug tests, and had failed to comply with other drug-use provisions throughout the course of the treatment plan. Testimony also indicated that Sabrina had made no progress toward the treatment plan goal of providing a safe and stable environment for M.D.

12. ¶ Sabrina's maternal aunt testified that she and her husband had parented M.D. for 15 of the child's first 23 months. At the time of the hearing, the aunt and her husband had been formally approved as foster parents by the Department, and wished to adopt M.D. The aunt testified that M.D. had been traumatized by the changes in custody as well as the sporadic visitations with Sabrina during the past two years. These claims were supported by expert testimony.

13. ¶ The six-part treatment plan prepared for Sabrina was contested on the grounds that it did not contain a provision directing her to seek help regarding the abusive relationship she had with Kenneth, or identifying a possible source of such help. Testimony indicated that Sabrina had suffered frequent physical abuse by Kenneth, and this was an over-looked factor in her treatment plan. Further testimony, in fact, indicated that Sabrina was not physically addicted to any substance; rather, her drug use was inextricably entwined with the abusive relationship with Kenneth. Such testimony suggested that the plan was inappropriate in that until the abusive relationship was addressed, any plan to stem Sabrina's drug use would be ineffective.

14. ¶ Sabrina's Department social worker testified, however, that upon her recommendation Sabrina underwent counseling regarding her relationship with Kenneth After she missed several visits, however, the counselor terminated his services.

15. ¶ The District Court entered its Findings of Fact, Conclusions of Law, and Order on March 19, 1999, terminating Sabrina's parental rights to M.D., and awarding those rights to the Department with the right to consent to adoption

16. ¶ From this order, Sabrina now appeals.

## Standard of Review

17. ¶ This Court reviews a district court's conclusions of law to determine whether the court interpreted the law correctly. *See In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11 (citations omitted). We review the court's findings of fact to

determine whether the court's findings are clearly erroneous. *In re J.N.*, ¶ 11 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *In re J.N.*, ¶ 11 (citations omitted).

18. ¶ This Court has further stated that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, ¶ 12 (quoting *In re R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848) (citations omitted). Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re J.N.*, ¶ 12 (citations omitted). Additionally, the party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *In re J. N.*, ¶ 12 (citations omitted).

19. ¶ Finally, when considering the criteria for termination, courts must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs. Section 41_3_609(3), MCA. *See also Matter of B.C.* (1997), 283 Mont. 423, 430, 942 P.2d 106, 110 (citation omitted).

## Discussion

*Did the District Court err in terminating Sabrina M.'s parental rights to M.D. due to a lack of clear and convincing evidence?*

20. ¶ The District Court adjudicated M.D. a youth in need of care pursuant to § 41-3-102, MCA (1997), and terminated Sabrina's parental rights to M.D. pursuant to § 41-3-609, MCA, which provides, in pertinent part:

(1) The court may order a termination of the parent_child legal relationship upon a finding that any of the following circumstances exist:

. . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been

complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

21. ¶ On appeal, Sabrina does not contest that M.D. was properly found by the District Court to be a youth in need of care. Rather, Sabrina's focal contention is that the District Court abused its discretion when it concluded that Sabrina had "not complied with the provisions of the treatment plan approved by the Court," and that her own condition was "unlikely to change within the foreseeable future." Sabrina argues that the testimony did not provide clear and convincing evidence on either of these two points. She further contends that the treatment plan was not "appropriate" because it failed to address her abusive relationship with Kenneth.

## A. Failure to comply with the treatment plan

22. ¶ The District Court found that Sabrina had tested positive for drugs on seven documented occasions in less than a year, and failed to appear for an eighth test during that time. Her plan specifically required that she "abstain from the use of alcohol or illegal drugs, and avoid association with people who abuse alcohol or use illegal drugs." The treatment plan also required that she not possess illegal drugs. The court concluded that she had not complied with these provisions of the treatment plan approved by the court.

23. ¶ As expert testimony elicited during the January 1999 hearing attests, a person battling with substance abuse and addiction may often relapse, but nevertheless eventually succeed in remaining drug free. Such testimony implies that a minor infraction of a treatment plan--one banning all use and contact with illegal drugs and illegal drug users--should not produce an ultimate, harsh penalty: the termination of that person's parental rights.

24. ¶ Here, however, the findings clearly show a continuous pattern of infractions, over a substantial period of time, where signs of hope or progress were the exceptions rather than the rule. All of the District Court's findings are supported by clear and convincing documentation and testimony. We conclude that there was more than substantial evidence upon which the District Court could find, and therefore correctly conclude, that Sabrina had not complied with the provisions of the treatment plan.

## B. The conduct or condition of the parent rendering her unfit is unlikely to change within a reasonable time

25. ¶ In reaching a conclusion that the conduct or condition of a parent that renders her unfit is unlikely to change in a reasonable time, a district court is guided by § 41-3-609(2), MCA (1997). Relevant here is subsection (d), which suggests that the court may consider "excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child." Furthermore, pursuant to § 41-3-609(3), a district court, in considering any of the factors in subsection (2) in terminating the parent-child relationship, must give primary consideration to the physical, mental, and emotional conditions and needs of the child.

26. ¶ Here, the District Court found that Sabrina had tested positive for drugs on seven documented occasions in less than one year, and failed to appear for a test, which carried the presumption of use. The undisputed evidence further showed that M.D. was removed three times from Sabrina's care following M.D.'s birth in 1997, due to Sabrina's documented drug use or incarceration. Based on expert testimony, the court found that this pattern of frequent disruptions in M.D.'s care was detrimental to M.D.'s well being. Expert testimony further indicated that Sabrina had made no progress in almost two years in providing a safe and stable environment for M.D., which was a requisite goal of her treatment plan. Testimony indicated that Sabrina had changed her residence 13 times since she has first become pregnant with M.D., and that she had twice informed her Department case worker that she intended to leave the state during the course of her treatment plan. Following the final drug test, on November 9, 1998, which was positive for the "maxed out" presence of methamphetamine, Sabrina did not contact her case worker for more than a month to learn of her status regarding M.D.

27. ¶ As this court has stated before "we do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct. *Matter of C.A.R.* (1984), 214 Mont. 174, 187, 693 P.2d 1214, 1221. Here, the District Court relied on clear and convincing evidence of Sabrina's past conduct in finding that her drug use, which unquestionably rendered her unfit, was unlikely to change within a reasonable time. Even after making well-documented progress in the summer of 1998, testing clean for drugs that September, and finally receiving custody of M.D. in early October, Sabrina quickly slipped into the same past conduct that had led to the State's involvement with her parent-child relationship in the first place. Obviously, as testimony indicated, there was no guarantee that this

pattern would not again repeat itself. Further, the testimony overwhelmingly indicated that numerous individuals and organizations had lent their support in assisting with Sabrina's attempts to follow her treatment plan, all with little or no success. Accordingly, we hold that the District Court's conclusion, that the conduct or condition of Sabrina rendering her unfit to care for M.D. was unlikely to change within a reasonable time, was supported by substantial as well as clear and convincing evidence, and was therefore correct.

28. ¶ Furthermore, we conclude that the District Court properly accorded substantial weight to the undisputed facts, as well as expert testimony, that M.D. spent 15 of her first 23 months in foster care, that she was attached to her foster parents who were ready and willing to adopt her, and she had shown little attachment to Sabrina. Although we find much of the testimony regarding Sabrina's potential for turning her life around compelling--especially if she has no contact with Kenneth, M.D.'s father--we agree with the District Court that M.D. has simply waited long enough--too long, in fact--to be placed permanently in a safe and stable environment with caring, responsible parents. Accordingly, we hold that the District Court properly considered the needs of M.D. in making its findings and reaching its conclusions.

## C. The treatment plan failed to address Sabrina's abusive relationship

29. ¶ Sabrina contends that although she signed the court-approved treatment plan, it was not "appropriate" pursuant to § 41-3-609(e)(i), MCA (1997). She argues that the six-part treatment plan should have contained a provision directing her to seek help regarding the abusive relationship she had with Kenneth, the biological father of M.D., and this omission destined the entire plan to failure because her substance abuse could not be effectively overcome until her role in the abusive relationship was resolved.

30. ¶ The fact that parents, while represented by counsel, stipulate to a treatment plan does not in and of itself prove that the plan was appropriate. *See Matter of R.H.* (1991), 250 Mont. 164, 169, 819 P.2d 152, 155. However, as we pointed out in *Matter of R.H.*, failure to add a missing component does not mean that the entire plan is deficient. We noted that the parents "neglected to comply with the parts of the program that were admittedly appropriate." *Matter of R.H.*, 250 Mont. at 170, 819 P.2d at 155.

31. ¶ Included in the treatment plan here is a provision that the "Department will help in locating appropriate services." The testimony of Sabrina's case worker indicated that counseling was suggested and initiated to specifically address Sabrina's

troubled relationship with M.D.'s father. The testimony revealed that Sabrina failed to continue such counseling, and this choice led to the service being terminated. In response, Sabrina has offered no evidence or argument that this counseling was not recommended, or that its termination did not result from her own conduct. As already established, Sabrina did not comply with the other, clearly appropriate treatment plan requirements. We conclude that substantial credible evidence supports the District Court's finding that the treatment plan was appropriate.

32. ¶ Accordingly, we conclude that the District Court properly determined that each statutory requirement was established, based on clear and convincing evidence, and that the court's findings were not clearly erroneous and its conclusions were correct.

33. ¶ Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER