DA 22-0015

FILED

08/23/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0015

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 167N

IN THE MATTER OF:

S.C.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DN-20-2
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Shannon Hathaway, Driscoll Hathaway Law Group, Missoula, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          Eileen Joyce, Butte-Silver Bow County Attorney, Mark Vucurovich,
Special Deputy County Attorney, Butte, Montana

Submitted on Briefs:  June 22, 2022

Decided:  August 23, 2022

Filed:

                        _____
                                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      K.B. (Mother) appeals the December 2021 Order of the Second Judicial District Court, Butte-Silver Bow County, terminating her parental rights to daughter S.C., born 2018.  We affirm.

¶3      On January 21, 2020, the Department of Public Health and Human Services, Child and Family Services Division (the "Department"), received information indicating Mother was an "active daily methamphetamine user" and could be found at a location known to be frequented by meth users.  Her car was identified at that location.  The Department was also notified that Mother and S.C. were living in a home with dangerous individuals.  Child Protective Specialist (CPS) Ryan Sas met with Mother, explained the reports, and asked her to provide a urinalysis (UA) drug test.  Mother refused the test, but she admitted to a history of meth use.  She stated her current use was only "recreational," that she "could quit at any time," and that S.C. was never present during her use.  Mother reported she was struggling with her mental health due to her recently strained relationship with S.C.'s

2

father. [1] That stress, Mother explained, caused her to relapse and start using meth again. CPS Sas visited S.C. and found the two-year old's physical condition "appalling" due to her being "remarkably dirty." Mother did not recognize her daughter's condition as concerning. The Department removed S.C. and placed her with paternal relatives.

¶4 The Department petitioned for Emergency Protective Services, adjudication of S.C. as a Youth in Need of Care (YINC), and for Temporary Legal Custody (TLC). At the February 26 show cause and dispositional hearing, Mother stipulated to TLC, and the District Court verbally granted the Department six months TLC. The District Court issued a written order on March 6 granting the Department's petition and stating: "This Order shall remain in effect until August 26, 2020 or until further order of this Court." The Order also set a treatment plan hearing for April 8. Mother changed attorneys, and her new counsel submitted a notice of substitution on April 1. CPS Sas emailed Mother's former attorney a copy of Mother's treatment plan on April 14. The April 8 treatment plan hearing did not occur, and there is no indication in the record that the District Court separately scheduled or formally continued the hearing.

¶5 The Department filed a "Motion to Continue Temporary Legal Custody Until Hearing" on July 23, 2020. The District Court granted the Motion the following day in an order the parties and court referred to as the "bridge order," noting good cause appeared

---

[1] The Department investigated both Mother and S.C.'s father, M.C., and initiated legal proceedings for both parents. M.C.'s parental rights were terminated in August 2021. He did not appeal, and we do not address the portions of the proceedings related to him.

for the extension and that TLC "shall continue until the Petition to Extend Temporary Legal Custody can be filed and a hearing held in the near future." Mother's new attorney was served with the bridge order. On August 27, the Department filed a motion to approve Mother's treatment plan, and it served Mother's attorney with the motion, the proposed treatment plan, and notice of treatment plan hearing scheduled for September 9. Mother did not appear at the hearing, and her attorney notified the District Court she had not yet discussed the treatment plan with Mother because "I have not reached her in the last two and a half weeks." The court approved Mother's treatment plan, stating, "I have reviewed it. I believe the treatment plan is appropriate under the circumstances . . . . I don't want to leave the treatment plan out there in limbo." Mother's treatment plan included the following tasks: complete parenting classes; complete chemical dependency and mental health evaluations with Department approval and input; submit to random drug testing as requested by the Department; participate in individual mental health therapy with an approved provider; obtain safe housing and inform the Department of any new addresses prior to moving; and "maintain consistent contact with [the Department]" by phone or in person on a biweekly basis.

¶6 On September 30, 2020, Mother filed a Verified Petition for Relief from Judgment (Petition for Relief). Therein, Mother asked the District Court to return S.C. to her care and dismiss all motions and orders filed or issued after August 26, 2020—the date TLC was set to expire under the court's March 6 Order, at least without regard to the additional phrase of the Order, "or until further order of this Court." Mother alleged that during the

4

six months between the court's Order and its expiration, the Department had provided her no services or support, and therefore had not fulfilled its obligation to make "reasonable efforts" to reunify her with S.C. She further argued the Department significantly delayed seeking approval of her treatment plan, which should have been ordered within 30 days of the dispositional hearing on February 26. The District Court did not rule on Mother's Petition for Relief.

¶7 On January 28, 2021, the Department filed a petition to extend TLC for an additional six months. The District Court scheduled a hearing on the petition, but continued the hearing multiple times to accommodate Mother and her attorney's schedule, and issued a second "bridge order" to continue TLC until the hearing. On March 31, Mother stipulated to extension of TLC to allow her additional time to complete her treatment plan. The District Court issued an order granting extension of TLC to the Department until October 1, 2021, "or until further order of this Court." On June 9, 2021, the Department filed a petition to terminate Mother's parental rights to S.C., on the basis that Mother failed to successfully complete her treatment plan. At the July 27 termination hearing, Mother's attorney reported Mother had discharged her as counsel. When Mother was unable to secure private counsel, the District Court ordered appointment of new counsel. Thus, after many delays, the termination hearing occurred on November 24 and December 1, 2021. CPS Joe Turner, who was assigned to S.C.'s case in September 2020, testified Mother had failed to successfully complete most of her treatment plan tasks, despite the Department's efforts. Mother contested termination, testified she did not receive her treatment plan until

September 9, and asserted she completed all treatment plan tasks except for random UA testing.

¶8     The District Court issued its order terminating Mother's parental rights to S.C. on December 13, 2021 (Termination Order).  The court concluded Mother had not complied with multiple aspects of her treatment plan, and that the conduct rendering her unfit to adequately care for S.C. was unlikely to change within a reasonable time.  Mother appeals, asserting both procedural and substantive errors.

¶9     We review a district court's decision to terminate parental rights for abuse of discretion.  "A district court's decision will not be disturbed on appeal unless there is a mistake of law or a finding of fact clearly erroneous that amounts to an abuse of discretion." "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made."  We review conclusions of law for correctness.  *In re J.B.*, 2016 MT 68, ¶¶ 9-11, 383 Mont. 48, 368 P.3d 715 (citations omitted).

¶10    Mother argues the Department and the District Court did not follow statutory requirements for both the extension of TLC and the timely provision of her treatment plan. Mother asserts these combined procedural errors prejudiced her and resulted in a violation of due process by denying her the guaranteed right to fundamentally fair procedures.[2] "[T]he termination in Montana of a natural parent's right to care and custody of a child is

---

[2] The Department argues Mother did not properly preserve these procedural objections for appeal. However, we conclude her Petition for Relief adequately raised these issues.

a fundamental liberty interest, which must be protected by fundamentally fair procedures" throughout the entirety of the proceedings. *In re R.B.*, 217 Mont. 99, 103, 703 P.2d 846, 848 (1985); *In re C.J.*, 2010 MT 179, ¶ 26, 357 Mont. 219, 237 P.3d 1282 (citation omitted). Accordingly, a parent "may not be placed at an unfair disadvantage during the termination proceedings." *C.J.*, ¶ 26 (citation omitted).

¶11 An order for TLC may not be in effect for longer than six months. Section 41-3-442(2), MCA. If the Department seeks an extension of TLC, it must petition the district court "[b]efore the expiration of the order" and show either "additional time is necessary for the parent or guardian to successfully complete a treatment plan" or that continuation of TLC is necessary due to the child's individual circumstances. Section 41-3-442(4)(a), MCA. The court may then extend TLC for an additional six months, but it must make specific findings about the child's best interests and the conditions upon which the child may be returned to the parent. Section 41-3-442(4)(a), (6), MCA.

¶12 Mother argues that "the Department's failure to file a timely petition or a supporting affidavit resulted in six months of additional TLC without the opportunity for Mother to be heard or the District Court making the required findings regarding whether an extension of TLC was necessary." The Department answers that the District Court properly extended TLC by its bridge order, pursuant to § 41-3-442(5), MCA, which allows a district court to "continue an order for temporary legal custody pending a hearing on a petition provided for in subsection (2)." The Department argues the statute "states the court may continue

7

TLC pending a 'hearing;' *it does not state that it may only do so if a petition had been filed.*" (Emphasis added.)

¶13    The Department's interpretation of subsection (5) would permit a court to extend TLC pending a hearing on an *unfiled* petition, apparently upon a mere representation of an intention to file a petition. Such a rendering would permit an extension of TLC to continue indefinitely without formal action by the Department, which occurred here. Upon Mother's stipulation to TLC on February 26, 2020, the District Court ordered six months of TLC, with a termination date of "August 26, 2020 or until further order of this Court." The Department moved for, and the District Court granted, continuation of TLC in mere anticipation of the Department filing a petition. However, despite the bridge order stating a hearing would be "held in the near future," the Department did not file its petition until January 28, 2021, approximately six months later, and only then did the District Court schedule the hearing. We do not believe this was the intended application of the statute. For a court to continue a TLC order "pending a hearing on a petition provided for in subsection (2)," § 41-3-442(5), MCA, a concrete subject for the pending hearing should exist, namely, a petition to extend TLC. Here, at the time the court granted the continuation of TLC in July 2020, the Department had not yet filed a "petition provided for in subsection (2)," nor was any hearing "pending." Neither would happen for six months. The Department relies on *In re A.D.B.*, 2013 MT 167, 370 Mont. 422, 305 P.3d 739, but there the Department filed a timely petition for extension of TLC before it expired. We held only that § 41-3-442(5), MCA, did not require the district court to rule on the petition

8

within the six-month period, but that it could continue its order for TLC pending a hearing on the filed petition. *A.D.B.*, ¶¶ 56-57.[3]

¶14 To be sure, the statute presents interpretational challenges. Subsection (5) authorizes a continuation of TLC pending a hearing on a petition "provided for in subsection (2)." However, subsection (2) does not provide for any petitions, stating only, "An order for temporary legal custody may be in effect for no longer than 6 months." Section 41-3-442(2), MCA. The Legislature may have intended for subsection (5) to instead cross-refer to subsection (4) ("[b]efore the expiration of the order for temporary legal custody . . . the county shall petition for one of the following . . ."). Our precedent regarding this statute and other instances of untimely petitions to extend TLC has not addressed these issues. *See In re L.H.*, 2021 MT 199, 405 Mont. 173, 492 P.3d 1218; *In re M.C.*, 2017 MT 252, 389 Mont. 78, 403 P.3d 1266; *In re A.D.B.* As it is not necessary for resolution of this case to resolve these issues, we will wait until they are presented in a case upon proper briefing.

¶15 Mother also correctly argues the Department failed to provide her with a court-approved treatment plan within the statutory timeline. The District Court held a dispositional hearing on February 26, 2020, and shortly thereafter adjudicated S.C. as a YINC. CPS Sas testified at the hearing the Department intended to develop a treatment

---

[3] Further, § 41-3-442(7), MCA, provides that "[i]f the time limitations of this section are not met, the court shall review the reasons for the failure and order an appropriate remedy that considers the best interests of the child." We are not confident this review was conducted by the District Court here.

plan for Mother, and the District Court set a treatment plan hearing for April 8. Yet, the hearing was never held, and the Department did not petition for approval of Mother's treatment plan until August 27. Mother's treatment plan was not approved and ordered by the court until September 9 — over six months after the deadline. *See* § 41-3-443(6), MCA ("A treatment plan must be ordered by no later than 30 days after the date of the dispositional hearing . . . except for good cause shown."). The Department sent a copy of the treatment plan to Mother's former attorney on April 14, but apparently it took several months for the Department to realize the error, and seek the court's approval.

¶16 "[I]n matters involving abused and neglected children, a district court may protect the children's best interests despite procedural errors, if the error would have no impact upon the ultimate result . . . . [I]f there is no showing of substantial injustice, the error is harmless." *In re A.L.P.*, 2020 MT 87, ¶ 26, 399 Mont. 504, 461 P.3d 136 (citations and internal quotation omitted). For Mother to establish a violation of due process, she "must demonstrate how the outcome would have been different had the alleged due process violation not occurred." *In re C.B.*, 2019 MT 294, ¶ 18, 398 Mont. 176, 454 P.3d 119 (citation omitted).

¶17 While we agree with Mother's identification of procedural errors, we conclude upon review of the record that the failure to follow statutory timelines here did not prejudice Mother or violate her due process rights. Regarding extension of TLC, the District Court's bridge order, issued approximately a month before expiration of TLC, gave Mother notice the Department sought the extension and that the court found "good cause" for a temporary

extension, in anticipation of a formal filing by the Department and a hearing. "In implementing the policy of [the statute governing TLC], the child's health and safety are of paramount concern." Section 41-3-442(8), MCA. By the time the hearing on TLC extension finally occurred, Mother was represented by counsel and stipulated to the extension, with Mother's attorney reporting to the court: "As she has not yet completed her treatment plan, I don't believe there's any legal basis to plan object to the extension of TLC." CPS Turner reported in his affidavit supporting the extension that S.C. was doing "extremely well" in her kinship foster placement. S.C.'s paramount health and safety interests were protected here as Mother had still not made the changes necessary to safely parent her daughter by the time the Department filed its late petition. Section 41-3-442(8), MCA. Given these facts, the procedural error had no impact on the ultimate result— extension of the Department's TLC of S.C. *A.L.P.*, ¶ 26.

¶18     Regarding the untimely provision of Mother's treatment plan, the record shows Mother was aware of the Department's main treatment objectives well before the court approved and ordered her plan. At the February 26 dispositional hearing, CPS Sas testified he had "spent time with [Mother] already kind of pre-planning what the treatment plan may look like." He testified her plan would focus on her admitted meth use, that the Department "would like to have that addressed through chemical dependency," and that Mother had contacted the SMART program to set up an evaluation. CPS Sas also testified Mother's plan would need to address the mental health concerns leading to her relapse. Text records between CPS Sas and Mother show Mother inquiring about the option of drug court as

11

early as February 5. Two days after the hearing, CPS Sas made a referral to the Butte Family Drug Court. Mother did not respond when the Drug Court twice attempted to contact her, and it notified CPS Sas her case was moved to "inactive." Further text conversations show Mother knew she needed to obtain mental health and chemical dependency evaluations as early as March 2020. CPS Sas also referenced the need to discuss Mother's treatment plan, and, when Mother asked him what she must do to get S.C. back, he suggested Mother ask her attorney to "put your treatment plan on the court calendar." In July 2020, CPS Sas texted Mother: "[Y]ou repeatedly refused to UA for me. I understand you may be sober right now and that's great, but we want consistency." This correspondence demonstrates Mother's earlier awareness of the main requirements in her treatment plan, including consistent UA testing. It also shows the Department attempted to assist her with these tasks before the court approved her treatment plan.

¶19 While Mother did not receive her complete, written treatment plan until the court approved it on September 9, 2020, the Department did not file for termination until nine months later on June 9, 2021, and Mother's parental rights were not terminated until December 2021. CPS Turner testified that during December 2020 and January 2021, he made multiple referrals for Department-informed mental health and chemical dependency evaluations, and between January and May 2021, he sent Mother four noncompliance letters outlining the tasks Mother still needed to complete for her treatment plan. He received no response from Mother, and she did not follow through with the referrals. Mother's progress on her treatment plan objectives was not prejudiced here by the untimely

provision of her court-approved plan, because she cannot demonstrate a different outcome if the Department had formally provided her a treatment plan within the statutory timelines. *C.B.*, ¶ 18. The procedural deficiencies in this case were harmless error and did not place Mother at a disadvantage during the termination proceedings. *A.L.P.*, ¶ 26; *C.J.*, ¶ 26. It also appears the procedural delays are in part explained by the COVID-19 pandemic, impacting both court scheduling and the Department's efforts. Additional delays resulted from the actions or requests of Mother and her changing counsel.

¶20 However, we are very concerned that the District Court was formally alerted to the procedural issues in Mother's Petition for Relief and did not address what were legitimate legal issues. A continuance of the scheduled April 8 treatment plan hearing should have been ordered. For its part, the Department showed apparent lack of concern about the statutory requirements designed to protect Mother's fundamental liberty interests. *R.B.*, 217 Mont. at 103, 703 P.2d at 848. To that end, we stress to all concerned parties that statutory procedures and deadlines in dependency proceedings are not designed to be malleable, but are to be followed in every case.

¶21 Mother next disputes the Termination Order on substantive grounds, specifically, the District Court's finding she was unlikely to change within a reasonable time under § 41-3-609(1)(f)(ii), MCA. A district court may terminate parental rights to an adjudicated YINC upon findings, established by clear and convincing evidence, that 1) "the parent failed to comply or failed to succeed at an appropriate, court-ordered treatment plan"; and 2) "the conduct or condition rendering the parent unfit is unlikely to change within a

13

reasonable time." *In re D.B.*, 2007 MT 246, ¶ 29, 339 Mont. 240, 168 P.3d 691 (citing § 41-3-609(1)(f), MCA). Here the District Court found both statutory requirements for termination satisfied.

¶22 Mother argues the court could not make this finding because the Department failed to provide Mother with timely, reasonable efforts to reunify her with S.C. The Department is required to "make reasonable efforts . . . to reunify families that have been separated by the state." Section 41-3-423(1)(a), MCA. "Reasonable efforts" means the Department acts in good faith to "develop and implement voluntary services agreements and treatment plans that are designed to preserve the parent-child relationship," and assists the parent in completing the services agreements and treatment plans. Section 41-3-423(1)(b)(i), MCA. "Although determination of whether the Department made reasonable efforts is not a separate requirement for termination, it is a predicate for finding that the conduct or condition rendering a parent unfit, unwilling, or unable to parent is unlikely to change within a reasonable time." *In re R.J.F.*, 2019 MT 113, ¶ 26, 395 Mont. 454, 443 P.3d 387 (citing *D.B.*, ¶ 25).

¶23 The Department's reasonable efforts here included a referral for Drug Court immediately following the dispositional hearing, multiple referrals for Department-approved chemical dependency and mental health evaluations at two different locations, kinship placement of S.C. as recommended by Mother, regular supervised visitation with S.C., and many attempts to communicate with Mother about her lack of progress and get her enrolled in random UA testing. *See* § 41-3-423(b)(ii)(A-E), MCA. These efforts

14

aligned with the tasks in Mother's individualized treatment plan and were "designed to address [Mother's] treatment and other needs precluding [her] from safely parenting." Section 41-3-423(1)(b)(ii)(D), MCA. "Although the State may assist the parents in completing the treatment program, the parents retain the ultimate responsibility for complying with the plan." *In re R.H.*, 250 Mont. 164, 171, 819 P.2d 152, 156 (1991) (citation omitted). Mother had the obligation "to avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan." *R.J.F.*, ¶ 38 (citations omitted). In this case, Mother only availed herself of some Department services such as visitation, while choosing not to cooperate with the Department on other treatment plan tasks, notably referrals for informed evaluations and drug testing.

¶24 Mother next argues the Department did not meet its burden to present clear and convincing evidence showing her conduct was unlikely to change within a reasonable time. "The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been satisfied. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing." *R.J.F.*, ¶ 20 (citation omitted); § 41-3-609(1), MCA. In the context of § 41-3-609(1)(f)(ii), MCA, the "conduct or condition rendering the parent unfit" is the conditions or reasons that caused the parent's treatment plan to be unsuccessful. *J.B.*, ¶ 22. The District Court concluded Mother "has been unsuccessful in her treatment plan because of her failure to comply with Department requests" and "[i]t is

believed the birth mother has continued to use methamphetamines, and refuses to work with the Department . . . . Mother's emotional illness, mental health illness, and unaddressed chemical abuse over the term of the Department's involvement render it impossible" for her to parent S.C.

¶25 At the termination hearing, Mother insisted she had successfully completed all treatment plan tasks other than random UA testing. This is despite CPS Turner sending four letters advising her she was noncompliant with multiple aspects of her treatment plan, and specifically asking her to enroll in UA testing. CPS Turner testified that within the nearly two years since the Department removed S.C., it "has never received any UA results or been notified of any UA testing" for Mother. Mother's treatment plan clearly notified her that any "failure to submit to scheduled or random testing as requested . . . shall be considered to indicate alcohol or drug use." Mother admitted she had not "done anything to alleviate the department's concerns" about her meth use. She testified that, if the District Court did not terminate her rights to S.C., she would start UA testing, but only because she had no other option. When examined on this point by the District Court, Mother persisted in making excuses for why she could not previously UA test and asking for alternatives. Mother's testimony showed she lacked the awareness and willingness to do what was necessary to follow Department directions in order to complete her treatment plan, and to change her concerning behaviors within a reasonable time. The Termination Order contained all required findings related to Mother's likelihood to change, *see* § 41-3-609(2), (3), MCA, and these findings were supported by clear and convincing evidence.

¶26 Mother lastly argues the District Court relied on clearly erroneous factual findings to conclude she did not engage with the Department and would not change in a reasonable time. With one exception,[4] substantial evidence supports each finding for which Mother asserts clear error. She mainly points to conflicting evidence, but "[s]ubstantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if weak and conflicting." *J.B.*, ¶ 24 (citation omitted). We also review the evidence in the light most favorable to the Department as the prevailing party. *J.B.*, ¶ 10 (citation omitted). The District Court found Mother did not complete chemical dependency and mental health evaluations, despite multiple referrals by the Department. Mother testified she obtained the evaluations, but CPS Turner clarified she completed evaluations in which she minimized her meth use and mental health issues, and which had been uninformed by contrary input by the Department. He testified that Mother's self-reporting was not compliant with her treatment plan, did not help her, and did not address the Department's concerns that led to S.C.'s removal. The District Court also found Mother "has not obtained safe housing to the Department's knowledge." CPS Turner testified that, to his knowledge, Mother's living conditions had not changed. Mother testified she moved into a new home six months prior to the termination hearing, but that the Department never

---

[4] The only erroneous finding by the District Court was regarding parenting classes. Although CPS Turner's affidavit stated the Department had not received documentation confirming Mother completed the classes, CPS Turner subsequently testified at the termination hearing that she had completed the classes. On this finding, the District Court "misapprehended the effect of the evidence." *J.B.*, ¶ 10. But the court did not rely on this finding to conclude Mother was unlikely to change, but rather focused on her unaddressed drug and mental health concerns, as well as her noncompliance with Department directions, and these critical findings were not clearly erroneous.

17

inquired about her housing, and she never informed the CPS. According to Mother's treatment plan, it was her responsibility to inform the Department of any new addresses prior to moving and to "maintain consistent contact" with the Department. She did not follow these requirements; therefore, the Department could not verify she obtained safe housing. CPS Turner's testimony was substantial evidence in support of the court's findings, even if it conflicted with portions of Mother's testimony. *J.B.*, ¶¶ 10, 24. It was the District Court's exclusive role to judge the credibility of witnesses and weigh conflicting testimony. We decline to second guess its determinations. *In re Conservatorship of H.D.K.*, 2021 MT 254, ¶ 38, 405 Mont. 479, 497 P.3d 1171 (citation omitted).

¶27 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court did not abuse its discretion in terminating Mother's parental rights.

¶28 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

18