No. 91-303

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

IN THE MATTER OF
DECLARING J.R. AND S.D.,
Youths in Need of Care.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin,
               The Honorable Roy Rodieghiero, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Jeannette Ellen Berry, Bozeman, Montana

        For Respondent:

        Hon. Marc Racicot, Attorney General; Paul Johnson,
        Assistant Attorney General, Helena, Montana
        A. Michael Salvagni, County Attorney; Marty Lambert,
        Deputy County Attorney, Bozeman, Montana
        Mark Bryan; Bryan & Atkins, Bozeman, Montana
        Susan B. Swimley, Guardian Ad Litem, Belgrade,
        Montana.

Submitted on Briefs:   February 6, 1992

                     Decided:   June 11, 1992

**FILED**

Filed:   JUN 1 1 1992

        *Ed Smith*
CLERK OF SUPREME COURT
   STATE OF MONTANA

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

This is an appeal from the judgment of the District Court of the Eighteenth Judicial District in Gallatin County, terminating the parental rights of the natural mother. We affirm

The issues on appeal are whether the mother's treatment plan ordered by the District Court was appropriate, and whether the termination of her parental rights violated her right to due process.

Appellant is the natural mother of J.R. and S.D., as well as two older children. The Montana Department of Family Services first had contact with the mother in 1979 after reports of poor hygiene, lack of supervision, and physical abuse of the two oldest children were brought to the Department's attention. The mother subsequently entered into an agreement with the Department to seek day care for J.R. and therapy counseling for the two oldest children.

In 1984 and 1985, the family was living in Idaho Falls, Idaho. The Idaho Department of Family Services received reports similar to those made in Montana. The Idaho DFS intervened, and the two oldest children were placed in protective supervision with the mother's sister in Bozeman, Montana. Following a divorce in 1986, the mother returned with J.R. to the Bozeman area. School authorities noted that J.R. evidenced the same lack of hygiene that her older siblings had shown. J.R.'s kindergarten teacher eventually contacted a social worker, Gloria Edwards, who met with J.R. in September 1989, and confirmed her lack of good hygiene.

2

Edwards filed a Request for a Petition for Temporary Investigative Authority that was not acted upon by the county attorney's office.

In April 1990, Ms. Edwards was again called to the school to see J.R. Edwards gave the following description of J.R.'s condition:

> She was absolutely filthy. She had dirt on her arms, her hands and her face. And her hair looked all sticky and it had things stuck all over it. And I couldn't tell what they were. I thought it looked maybe like leaves. It was difficult to distinguish. When the other kids left, then I had her roll up her long sleeves and her arms had caked-on dirt just stuck to her. Her teeth also looked really brown and rotting.

Edwards spoke with the child at length, and J.R. divulged information that led Edwards to believe she was being sexually molested by a male baby sitter. Edwards decided to invoke emergency protective powers and remove J.R. and S.D. from their home. A hearing was held, and the District Court ruled that removal of the children from the home was appropriate. An investigation that had been ongoing since September 1989 resulted in the arrest of the suspect on charges of sexual assault of J.R. on April 10, 1990. The individual was found guilty in a bench trial of sexual assault of J.R. and sentenced to the Montana State Prison. The sentence was affirmed by this Court in State v. Davis (Mont. 1992), ___ P.2d ___, 49 St. Rep. 342.

A hearing on the State's petition for termination of parental rights was held on December 17, 18, and 19, 1990. Several State's witnesses testified to the lack of success of the court-ordered treatment plan and treatment contract. Reasons given in support of

3

termination included: the refusal of the mother to admit any parenting problems; the lack of concern over the sexual abuse of J.R.; the cyclical nature of sexual abuse and physical neglect in the family, as evidenced by the two oldest children; the inability of the mother to protect the children, given that the grandmother of the children was sexually involved with Davis and gave testimony in his defense; the lack of normal interaction between the mother and children during supervised visits; the continuing health and safety problems at the mother's residence; and the great progress that J.R. showed both academically and socially since being removed from the mother's home.

The District Court concluded that the treatment plan had not been complied with, and that the situation rendering the mother an unfit parent was unlikely to change in the future. The court concluded that the mother's professionally diagnosed chronic paranoia was of such a nature that it rendered her unlikely to care for the ongoing physical, mental, and emotional needs of her children. The court, therefore, terminated the parent-child relationship between the mother and J.R. and S.D. Custody of J.R. was given to the Montana Department of Family Services. Custody of S.D. was given to her natural father. The mother appeals from this judgment.

The mother contends that the court-ordered treatment plan was inappropriate, resulting in the termination of her parental rights without due process of law.

4

Section 41-3-609, MCA (1989), sets forth the criteria for termination of the parent-child relationship. The statute states in part:

(1) The court may order a termination of the parent-child legal relationship upon a finding that the circumstances contained in subsection (1)(a), (1)(b), or (1)(c), as follows, exist:

. . . .

(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making such determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

. . . .

(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an

5

evaluation of the child's or the parent's physical, mental, and emotional conditions.

The mother contends that the treatment plan implemented in her case was not appropriate, as required by § 41-3-609(1)(c)(i), MCA. She asserts that the court failed to consider her financial situation when it ordered her to undergo a treatment plan. She claims that the court's failure resulted in her inability to receive proper treatment that would have facilitated the preservation of the parent-child relationship as promoted by the statute and case law.

The mother contends that the primary goal of her treatment plan was psychological therapy. She states she was ordered by the court to pay for her own therapy and was unable to do so because she was indigent, dooming the treatment plan to failure. She contends that because the treatment plan was a fundamental element of the termination procedure, she was denied due process.

The termination of parental rights invokes fundamental liberty interests. *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599. The State bears the burden of proving by clear and convincing evidence that all statutory criteria needed to terminate parental rights have been met, including the appropriateness of the treatment plan. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403, 71 L. Ed. 2d at 616; *In re L.W.K.* (1989), 236 Mont. 14, 18, 767 P.2d 1338, 1341. In this case, the treatment plan was agreed upon by the mother with the advice of her counsel. While that fact should be given consideration it does not by itself

6

prove the plan was appropriate. *Matter of R.H.* (Mont. 1991), 819 P.2d 152, 155, 48 St. Rep. 692, 694.

The court-ordered treatment plan and contract entered into by the mother states that the goal of the agreement is "to assist [the mother] in improving her protection and parenting abilities with her children . . . ." The return of the children to the mother was contingent upon the successful completion of the tasks outlined in the contract and the continued evaluation by the Department of Family Services and other professionals described in the contract regarding the mother's capacity to adequately protect and care for her children. Among the specific tasks outlined for the mother were:

1. I agree to contact a psychologist of my choice and obtain a psychological evaluation as soon as possible. I agree that this evaluation will specifically address my ability to understand the needs of children and my capacity to make necessary changes to adequately protect and care for my children. I agree to allow the psychologist access to all available background information on my parenting difficulties.

2. I agree to continue weekly mental health counseling with a psychologist or licensed professional counselor of my choice. I agree to allow communication between the counselor and DFS representative regarding my progress in making necessary changes to understand the needs of my children and to adequately protect and care for them.

. . . .

5. I agree to allow the Gallatin County Health Department to make unannounced visits a minimum of one time monthly to determine if my living conditions are sanitary and suitable for young children. Results of each visit will be made available to myself and to the DFS representative.

7

An evaluation on the mother was performed by Dr. Richard Traynham, a licensed clinical psychologist. Relying on standard psychometric tests, clinical interviews, and background information provided by the DFS, Dr. Traynham concluded that the mother suffered from a chronic, entrenched paranoid personality disorder. Dr. Traynham discussed the results of his evaluation with the mother. His conclusions were that therapy would not be beneficial at that time due to the entrenched nature of her paranoid personality disorder. He noted that the mother consistently refused to admit that she had any problems, making the prognosis for change and a beneficial therapeutic relationship poor. Consequently, Dr. Traynham supported the termination of the mother's parental rights.

Visits to the mother's home by the Gallatin County Health Department officials pursuant to the contract demonstrated an environment which was unsuitable for children. An open irrigation ditch ran adjacent to the mobile home, garbage and clutter surrounded the property, and the home itself had no running water and was filthy and cluttered. During one visit, the mother fled from the home to avoid the officials and was found waist deep in the water, hiding behind a tree. She returned to her home at the request of the officials. The mother later moved to another mobile home which was in an adult's only section of the park. When asked by the manager if she intended to bring her children to live with her, she responded that she intended to leave the state upon reobtaining custody of the children.

8

There was substantial testimony regarding the failure of the court-ordered treatment plan. The stated goal of the plan was to assist the mother's parenting abilities. It addressed changing behavior to accept responsibility for the children, and to make the home environment healthy and safe. The testimony indicated that the home environment continued to be grossly inadequate in terms of health and safety, and that the mother continued in her denial of any parenting difficulties, including that J.R. had ever been abused. When the treatment plan was initiated by the court, the condition of the mother's mental state was not known. Upon psychiatric evaluation, it became apparent that the mother's mental illness was of such a nature that further mental counseling would be of little therapeutic benefit. Under these circumstances, the treatment plan implemented in the mother's case was appropriate.

Substantial evidence was presented that the children were abused and neglected; that the mother's mental state rendered her an unfit parent; and that the situation was not likely to change within a reasonable time. Evidence showed (1) that the mother's residences were consistently unsuitable for children; (2) that J.R. was dirty and evidenced social and scholastic impediments while in the mother's care, and that marked improvement occurred upon removal from her care; and (3) that the mother showed a serious ambivalence in regard to her role as a mother, a lack of good judgment and an incapacity to provide long-term care and protection for her children. The decision of the district court to terminate parental rights will not be disturbed on appeal unless there is a

9

mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *Matter of S.P.* (1990), 241 Mont. 190, 786 P.2d 642. There is substantial, credible evidence in this case to support the District Court's conclusion that J.R. and S.D. are youths in need of care, that the treatment plan was unsuccessful, and that the mother's condition is unlikely to change within a reasonable time. Accordingly, we affirm the judgment of the District Court.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

10