No.   94-290

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

FILED

APR 25 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

IN THE MATTER OF THE CUSTODY
AND PARENTAL RIGHTS OF M.M.,

Youth in Need of Care.


APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey Sherlock, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

James B. Obie, Attorney at Law, Helena, Montana


For Respondent:

Hon. Joseph P. Mazurek, Attorney General; John
Paulson, Ass't Attorney General, Helena, Montana

Mike McGrath, County Attorney; Carolyn A. Clemens,
Deputy County Attorney

Randi Hood, Public Defender, Helena, Montana


Submitted on Briefs:   January 12, 1995

Decided:   April 25, 1995

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court

Richard M. (Richard), the natural father of M.M., appeals from the findings of fact, conclusions of law and order entered by the First Judicial District Court, Lewis and Clark County, which terminated his parental rights to M.M. We affirm, holding that the District Court did not err in concluding that the treatment plans provided for Richard were appropriate.

M.M. was born on July 11, 1989, to Richard M. and Elizabeth L. In September 1992, the Lewis and Clark County Department of Family Services (DFS) placed M.M. in emergency protective custody following a report that Richard had taken him to a bar and spent the day drinking, leaving M.M. unattended. On September 9, 1992, Richard signed a stipulation agreeing to DFS' temporary investigative authority over M.M. and preparation of a treatment plan for Richard. The District Court approved the stipulation on the same day.

Richard signed the treatment plan on October 29, 1992, and the District Court subsequently approved it. The two goals of the treatment plan were for Richard to exhibit stability in his everyday lifestyle and end his dependence on alcohol. Richard was required to maintain stable and safe housing, obtain a psychological evaluation, complete approved parenting classes and ensure that any adult residing in his household abided by the provisions of the treatment plan. He also was required to obtain a chemical dependency evaluation and follow the evaluator's recommendations.

On March 23, 1993, the District Court extended the treatment plan for an additional six months. Two months later, Chris Valdez (Valdez), the Lewis and Clark County (County) social worker assigned to the case, reported that Richard was dishonest with alcohol counselors and refused to participate in parenting classes. Valdez recommended that Richard receive a psychological evaluation, as required by the treatment plan, and continue to work towards completing the plan. On May 25, 1993, the County, acting on behalf of DFS, petitioned for adjudication of M.M. as a youth in need of care.

On June 9, 1993, pursuant to a revised treatment plan signed by both Richard and his attorney and in accordance with a stipulation, the District Court ordered DFS to retain temporary custody and investigative authority over M.M. The revised treatment plan, approved by the court, required Richard to complete parenting training with Greg Daly (Daly), take classes on fetal alcohol syndrome, participate in Alcoholics Anonymous (AA) and submit to 30 days of alcohol testing. The revised treatment plan was to remain in effect for 90 days and stated specifically that Richard's failure to abide by its terms would result in DFS petitioning to terminate his parental rights to M.M.

Richard showed little, if any, progress on the goals and tasks of the treatment plan during the following months, according to Valdez's October 21, 1993, report. Richard had moved eleven or twelve times during the course of Valdez's management of the case and was involved with three different women, each of whom he

3

required M.M. to address as "mother." At the time of the October 1993 report, Richard recently had married Toni M. They lived in a two-bedroom apartment with seven other people, including Richard's brother Thomas, a convicted child molester, and his brother's wife, a convicted felon. Toni's parental rights to two of her children had been terminated, she was caring for her 18-month-old child and she and Richard were expecting a child.

Valdez also reported that Richard had failed to attend AA and failed to report for alcohol testing. Following Valdez's report, the County petitioned for the termination of Richard's parental rights and for permanent legal custody of M.M. with the right to consent to adoption.

On January 4 and 11, 1994, the District Court held a hearing on the termination petition. Many of the professionals who had worked with M.M. and Richard over the course of the preceding two years testified, discussing the specific problems facing M.M. and Richard, and Richard's failure to comply with the requirements of the treatment plan.

Following the hearing, the District Court entered extensive findings of fact, conclusions of law and an order terminating Richard's parental rights. Richard appeals.

Did the District Court err in concluding that the treatment plans approved for Richard were appropriate?

Section 41-3-609, MCA, sets forth the criteria for termination of the parent-child relationship. Termination is authorized if the court determines that the child is a youth in need of care and both

4

of the following exist:

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Section 41-3-609(1)(c), MCA.

The termination of parental rights involves fundamental liberty interests. Matter of J.R. (1992), 253 Mont. 434, 438, 833 P.2d 1063, 1066 (citation omitted) As a result, the party petitioning for termination has the burden of proving by clear and convincing evidence that the statutory criteria needed to terminate parental rights have been met. Matter of J.R., 833 P.2d at 1066. A district court's conclusions of law in a termination proceeding are reviewed to determine if they are correct. Matter of J.J.G. (1994), 266 Mont. 274, 281, 880 P.2d 808, 812 (citation omitted).

In this case, we focus on the § 41-3-609(1)(c)(i), MCA, criterion for termination involving whether the parent complied with an appropriate treatment plan. It is essentially undisputed that Richard did not comply with either the original, or the revised, plan and, indeed, he does not challenge any of the court's extensive findings relating to his lack of compliance.

Richard argues that the District Court erred in concluding that he was provided with an appropriate treatment plan prior to termination of his parental rights. While he makes a passing reference to a separate statutory factor regarding whether DFS made reasonable efforts to rehabilitate him (see § 41-3-609(2)(g), MCA),

the thrust of his argument is that a psychological evaluation of him should have been obtained earlier than August 1993. According to Richard, an earlier evaluation would have highlighted both his borderline intellectual functioning and the need for a treatment plan taking his limitations into account.

This Court has not specifically defined what constitutes an "appropriate" treatment plan as a matter of law and, indeed, no such bright line definition is possible given the unique circumstances existing in each case. We have, however, recognized several factors applicable to determining whether a treatment plan is appropriate. One such factor is whether the parent was represented by counsel and stipulated to the treatment plan. <u>See</u> Matter of R.H. (1991), 250 Mont. 164, 169, 819 P.2d 152, 155. Here, both Richard and his counsel stipulated to the June 1993 treatment plan. While this fact does not establish that the plan was appropriate, it is entitled to consideration. <u>Matter of J.R.,</u> 833 P.2d at 1066.

Other factors which must be taken into consideration in determining whether or not the individual treatment plan is appropriate are the particular problems facing both the parent and the child. <u>See</u> Matter of S.C. (1994), 264 Mont. 24, 29, 869 P.2d 266, 269; <u>Matter of J.R.,</u> 833 P.2d at 1065-66. In this case, it is clear that DFS considered the particular physical and mental problems facing both M.M. and Richard when devising and implementing the treatment plans.

Dr. William Fulton (Fulton), a child psychiatrist and the

6

medical director of child psychiatrist services at Shodair Hospital, testified regarding M.M.'s problems at the termination hearing. Fulton evaluated M.M. in December 1992, after M.M. was admitted to address problems exhibited while in foster care, including developmental and speech delay, self-injurious behavior and aggression. According to Fulton, M.M. was functioning at the level of an 18-month-old infant at age 41 months. Fulton's evaluation also disclosed that M.M. was plagued by a number of physical and mental problems, including reactive attachment disorder, often the result of grossly neglectful caretaking; possible post-traumatic stress disorder; mental retardation; fetal alcohol syndrome; and a cleft palate.

Fulton opined that M.M. needed a parent who could intellectually understand his condition and provide a stable, consistent and loving environment. This opinion was echoed by Dr. Susan Lewin, another Shodair physician trained in pediatrics and medical genetics who had evaluated M.M.

The two broad goals of the treatment plan were for Richard to maintain a stable lifestyle and to break his dependency on alcohol. To meet these goals, Richard was responsible for obtaining safe and stable housing, attending parenting and fetal alcohol syndrome classes, obtaining a psychological evaluation and refraining from the use of alcohol. Given Richard's documented alcohol problem and transient lifestyle, these goals not only dovetailed into Fulton's opinion of M.M.'s needs, but also were pertinent to Richard's individual problems.

7

Besides the terms of the treatment plans, the professionals who worked with M.M. and Richard also attempted to deal with their unique problems. These social workers testified that they understood both M.M.'s and Richard's particular needs and tried to assist Richard in confronting and resolving these issues. Ultimately, they concluded that Richard's inability to admit and confront both his own and M.M.'s problems caused his failure with the treatment plans.

Richard points out that the psychological evaluation performed in August 1993 revealed he had borderline intellectual functioning. On this basis, he argues that an appropriate treatment plan should have provided him with such an evaluation earlier and then taken the limited mental capabilities it disclosed into account in designing the remainder of the plan. His argument is not persuasive.

The October 1992 treatment plan prepared for Richard included the requirement that he "contact a Department of Family Services approved therapist to obtain a psychological evaluation and . . . follow any recommendations." He did not do so. The June 1993 treatment plan included a nearly identical requirement. Richard did not obtain the evaluation until August 1993 at which time his borderline intellectual functioning was officially discovered during a neuropsychological examination at St. Peter's Hospital. While it is true that the State may assist a parent in completing the treatment program, the parent retains the responsibility for complying with the plan. Matter of R.H., 819 P.2d at 156 (citation

8

omitted).  Richard was responsible for obtaining the evaluation at an earlier time and simply failed to do so.

More importantly, however, Richard has not established how earlier knowledge of his condition would have affected either the particular requirements of the plan or the professionals' work with Richard and the plan.  Indeed, Richard has not argued with any specificity what modifications to the treatment plans would, or even might, have resulted from an earlier evaluation.  A plain review of the plans reveals that there is nothing complicated about the tasks Richard was required to complete.

In addition, the professionals who worked with Richard seemed to understand his limited intellectual abilities and tailored their interaction with him accordingly.  For example, psychotherapist Bill Evans (Evans) met with Richard on numerous occasions in the autumn of 1992 to work on his alcohol addiction, anger and impulsiveness.  When asked if Richard's limited intelligence had affected their work together, Evans stated that, while he would often have to repeat himself, Richard appeared to comprehend what he was saying.  In Evans' opinion, Richard's failure to respond to the counseling sessions was due to his lack of motivation to make the internal changes necessary to overcome his problems, not his limited intelligence.

Daly, the instructor for Richard's parenting training, also testified about the affect of Richard's limited intelligence on his progress under the treatment plan.  After working with M.M. and Richard together, Daly developed parenting goals for Richard which

included learning how to positively interact with--and discipline--M.M., and how to act as an appropriate role model. Daly testified that Richard resisted the education and would not accept or admit that his son had disabilities that required special attention. As a result, Daly saw no change in Richard's method of parenting. He ultimately opined that Richard would continue to refuse to learn the skills necessary to be an effective parent for M.M.

Daly was cross-examined about his knowledge of Richard's limited intelligence and its impact on their work together. Daly testified that he knew of Richard's limited intelligence from the beginning and tailored his instruction accordingly.

The District Court also heard testimony from Valdez about the affect Richard's intelligence had on his progress with the treatment plan. On cross-examination, Richard's attorney asked Valdez whether, if knowledge of Richard's limited intellectual abilities had been known earlier, his performance under the treatment plan would have been different. Valdez responded: "I guess what I see is that it is not as much [Richard's] functioning ability as his inability to . . . change how he functions and how he parents his child."

Kelly Moorse (Moorse), M.M.'s guardian ad litem, was the only witness who testified that advance knowledge of Richard's limited abilities would have benefited his progress under the treatment plans. She opined that earlier knowledge of Richard's condition would have assisted both Richard and the professionals working with him in dealing with his problems. Ultimately, however, Moorse

10

testified that, while such knowledge would have "helped in terms of approaches[,] I am not sure the outcome would have been any different." Moorse's report recommended termination of Richard's parental rights.

The inability of some parents to face deeply rooted personal problems, often identified in the treatment plan, is not uncommon. In Matter of J.R., the parent argued that a treatment plan requiring her to obtain psychological counseling was not appropriate because of her limited financial means. However, the professionals who worked with the parent testified that the failure of the plan resulted from her refusal to admit she had a problem, not from her financial situation. We affirmed the termination order, concluding that the District Court did not err in terminating the parent's rights. Matter of J.R., 833 P.2d at 1067.

As was the case in Matter of J.R., the failure of the treatment plan in this case is not the result of an inappropriate plan; it is the result of Richard's failure to admit and address the problems the treatment plan was designed to overcome. Nor was the plan inappropriate because it did not specifically recognize Richard's limited intellectual functioning. Earlier compliance by Richard with the requirement that an evaluation be obtained would have disclosed the information. Moreover, ample evidence exists that the professionals who worked with Richard on the treatment plans understood his level of intelligence and tailored their work accordingly. We hold, therefore, that the District Court did not err in concluding that Richard's treatment plans were appropriate

11

within the meaning of § 41-3-609(1)(c)(i), MCA.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

12