No. 99-071

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 35

298 Mont. 237

995 P. 2d 427

IN THE MATTER OF A.N. and C.N.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Bard G. Middleton; Middleton & Stewart, Billings, Montana

(attorney for father)

Kevin Gillen; Gillen Law Office, Billings, Montana (attorney

for mother)

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Mark W. Mattioli,,

Assistant Attorney General; Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Melanie Logan,

Deputy Yellowstone County Attorney, Billings, Montana

Guardian Ad Litem:

Damon Gannett; Gannett Law Firm, Billings, Montana

---

Submitted on Briefs: October 14, 1999

Decided: February 8, 2000

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

¶1.Eric Nichols (Eric) and Diana Nichols (Diana) appeal from the Findings of Fact, Conclusions of Law and Order entered by the Thirteenth Judicial District Court, Yellowstone County, terminating their parental rights to A.N. and C.N. and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶2.Eric raises the following issues on appeal:

¶3. Did the District Court commit reversible error in determining that Eric's third treatment plan was appropriate?

¶4. Is the District Court's finding of fact that Eric failed to comply with the treatment plans clearly erroneous?

¶In addition, Eric and Diana both raise the following issue:

¶5. Did the District Court commit reversible error by admitting hearsay?

## *BACKGROUND*

¶6.Eric and Diana are the natural parents of a daughter, C.N., born on November 22, 1992, and a son, A.N., born on July 18, 1996. Dr. Linda Johnson, a pediatrician, first examined A.N. in November of 1996, for a well-child examination and immunizations. Diana informed Dr. Johnson that A.N.'s scrotum had been swollen for a week and Dr. Johnson diagnosed the swelling as hydrocele, an accumulation of serous fluid around the testes. The condition was corrected surgically, but the surgeon informed Dr. Johnson that the fluid was not normal hydrocele, indicating that the fluid was "milky" rather than clear. Dr. Johnson examined A.N. again two months later. In response to Dr. Johnson's questioning at that time, Diana reported that A.N. was not putting any weight on his right leg and had not done so since she started standing him up the previous month. Dr. Johnson also asked if A.N. ever seemed to be in pain, and Diana responded that he did not. Dr. Johnson ordered tests, the results of which were normal.

¶7.On January 13, 1997, Dr. Johnson requested an x-ray for A.N. to determine the reason he would not put weight on his right leg and, when informed of the need for an x-ray, Diana volunteered that A.N. bruised easily. Dr. Johnson examined A.N. and found bruises all over his body, a swollen abdomen, and an uncommon "diaper rash," none of which had been present when she examined A.N. twelve days earlier. Dr. Johnson asked Diana about the abdominal swelling, and Diana responded that she had noticed the swelling in A.N.'s abdomen off and on for several months and that she sometimes noticed "red stuff" coming out of his rectum, as well as leakage of "watery stuff." The x-rays revealed a healing leg fracture. Dr. Johnson decided to hospitalize A.N. to discover the cause of the abdominal swelling and make sure he did not have a massive abdominal injury, as well as because of the healing leg fracture and the recent bruises.

¶8.DPHHS received a report that A.N. had been hospitalized, and the reasons therefor, on January 13, 1997. A DPHHS social worker interviewed Eric and Diana and they stated that A.N. bruised easily and they did not know the cause of his leg fracture.

¶9.While hospitalized, A.N. underwent several more tests. The tests revealed that A.N. had seventeen broken bones in various stages of healing, a bruise over his liver, and massive fluid in his abdomen which was later determined to be chyle leaking from the lymphatic system. Dr. Johnson noted that the "milky" fluid built up around his testes two months earlier was not serous fluid, but also was chyle. The tests further indicated that A.N. did experience pain and did not have any disorder which would explain either easy

bruising or excessive broken bones.

¶10.DPHHS received a report on January 14, 1997, which included many of the test results and the information that Diana intended to remove A.N. from the hospital. DPHHS placed a 48-hour hold on A.N. and informed Eric. After receiving additional test results, a DPHHS social worker explained to Eric that A.N.'s injuries had been determined to be due to nonaccidental trauma and that A.N. could not be removed from the hospital.

¶11.DPHHS petitioned for Temporary Investigative Authority (TIA) and protective services over A.N. and C.N. on January 16, 1997. When A.N. was released from the hospital on January 21, 1997, a DPHHS social worker removed C.N. from Eric and Diana's home, explaining that the diagnosis of nonaccidental trauma to A.N., without a plausible explanation by Eric or Diana, placed C.N. at an unacceptable level of risk. Both children were placed in foster care. The District Court granted DPHHS the TIA for 90 days beginning January 24, 1997, and scheduled a hearing in the event Eric and Diana desired to contest the TIA. The TIA subsequently was continued for an additional 90 days.

¶12.During February, both Eric and Diana visited C.N. each week; in March, only Eric visited her. When Eric failed to follow visitation guidelines set by DPHHS social worker Lori Buxbaum (Buxbaum), Buxbaum arranged for future visits to take place in family therapy under the supervision of C.N.'s therapist, and met with Eric to discuss this and other continuing concerns relating to the appropriateness of his visitation. Eric refused to visit under these conditions and the meeting ended before all issues had been resolved. He subsequently called Buxbaum and requested a visit with C.N., but was informed that the issues raised at the previous meeting would have to be resolved prior to a visit and the requested visit would take place in family therapy. Eric refused to meet with Buxbaum to resolve the outstanding issues and again refused to visit C.N. in a therapeutic setting.

¶13.DPHHS proposed treatment plans for Eric and Diana for the 90-day period beginning March 24, 1997. These treatment plans focused on stabilizing Eric and Diana's environment and improving their relationship with A.N. and C.N. Both Eric and Diana were required to obtain a psychological evaluation and follow through with all recommendations made by the psychologist. They also were required to meet with the social worker weekly and successfully complete parenting classes. Finally, they were required to visit C.N. as scheduled, abiding by the conditions set by the social worker, working with the social worker to plan appropriate visitation activities and using the information and skills learned at the parenting classes during visitation with C.N. The

District Court approved the treatment plans, but neither Eric nor Diana signed them.

¶14.Subsequently, Buxbaum met with Eric to obtain social and medical histories on A.N. and C.N. and to provide information regarding available resources for his treatment plan. He promised to return background information within a week, but failed to do so. Some of the requested background information ultimately was obtained through Eric and Diana's attorney.

¶15.In June of 1997, Eric and Diana underwent psychological evaluations. The results of Eric's evaluation were

Intelligence testing yielded full scale I.Q. of 121. Personality testing (MMPI-2) indicated a defensive profile with a paranoid scale . . . . The Beck Depression Inventory indicated a total score of zero indicating the absence of depressive symptomatology . . . . The Child Abuse Potential Inventory results indicated defensiveness to the extent that the results are considered invalid.

On the Parent Child Relationship Inventory, Eric "scored well above normal with very healthy findings in the following areas: parental support, satisfaction with parenting, involvement, communication, limit setting, and role orientation. He was within the normal range in autonomy; the willingness of Eric to promote a child's independence." On the Adult Adolescent parenting profile, "Eric scored above average in all four parenting dimensions assessed by this test instrument . . . ." Diana's evaluation produced similar results. The psychologist made no recommendations for treatment based on the evaluations. Eric and Diana also completed parenting classes.

¶16.DPHHS sent new treatment plans to Eric and Diana for the 90-day period beginning June 24, 1997, with the same terms as the original treatment plans. Again, Eric and Diana did not sign or return the plans, but the District Court approved them. Eric contacted Buxbaum requesting visitation with C.N., but continued to refuse to visit in family therapy as required. As a result, no visitation occurred. On July 9, 1997, DPHHS petitioned for temporary custody of A.N. and C.N.

¶17.On August 25, 1997, Buxbaum resigned, notified Eric and Diana that DPHHS social worker Pamela Weischedel (Weischedel) would be taking over their case and requested they contact Weischedel. When Weischedel did not hear from them, she notified Eric and Diana she had taken over the case, first by mail and then via a message left on their

answering machine. Finally, on September 30, 1997, Eric returned her call. He subsequently scheduled a meeting with her for October 16. During this meeting, Eric and Diana stated they wanted visitation, but Buxbaum had prohibited it. Weischedel explained that they had been allowed visitation in family therapy but had declined to participate. She discussed new treatment plans with them and made arrangements for visitation in her office rather than in a family therapy setting. Weischedel asked Eric and Diana if they were aware that criminal charges related to A.N.'s injuries might be brought against them, and they acknowledged they were.

¶18. On October 22, 1997, A.N. and C.N. were moved to a new placement at the request of the foster parents due to difficulties with C.N. and Eric and Diana resumed visitation shortly thereafter. DPHHS provided Eric and Diana with their third treatment plans, effective from November 1, 1997, through February 1, 1998. The goals set for Eric and Diana in these treatment plans were to increase their parenting skills, provide a safe and nurturing environment for the children, maintain and improve the parent-child bond, and resolve all issues that led to the abuse of A.N. The goals were to be accomplished by maintaining an appropriate home, participating weekly in individual therapy to address issues of parenting and domestic violence, demonstrating skills learned in parenting classes and therapy during visits with the children, and cooperating with any suggestions made by the social worker during--or related to--the visits. The third treatment plans also required Eric and Diana to explain the cause of A.N.'s injuries, assume responsibility for any injuries inflicted on A.N., cooperate with law enforcement on the criminal charges against them, and meet with the social worker at least biweekly to discuss their progress. The District Court again approved the treatment plans; Eric and Diana did not sign them.

¶19. On November 10, 1997, Eric and Diana were arrested and arraigned on felony assault and felony assault by accountability charges for the original injuries to A.N. That afternoon, their attorney stipulated to DPHHS' temporary custody of A.N. and C.N. The court ordered the temporary custody to remain in effect until January 14, 1998, and declared A.N. and C.N. youths in need of care.

¶20. On January 2, 1998, DPHHS petitioned for permanent legal custody, termination of parental rights, and the right to consent to adoption of A.N. and C.N. The District Court held a hearing and subsequently entered findings of fact, conclusions of law and an order terminating Eric and Diana's parental rights and granting DPHHS permanent custody with the right to consent to adoption. Eric and Diana filed separate appeals.

## *STANDARD OF REVIEW*

¶21.In a termination of parental rights case, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re S.M.*, 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶22. 15 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *In re S.M.*, ¶ 15 (citation omitted). We review a trial court's evidentiary rulings to determine if the court abused its discretion and we "will not reverse evidentiary rulings absent a manifest abuse of discretion." *Inquiry into M.M.* (1995), 274 Mont. 166, 169, 906 P.2d 675, 677 (citations omitted).

## *DISCUSSION*

¶23. **Did the District Court commit reversible error in determining that Eric's third treatment plan was appropriate?**

¶24.A "'natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures.'" *In re E.W.*, 1998 MT 135, ¶ 12, 289 Mont. 190, ¶ 12, 959 P.2d 951, ¶ 12 (quoting *In re R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848). Accordingly, DPHHS bears the burden of proving by clear and convincing evidence a treatment plan is appropriate. *Matter of R.H.* (1991), 250 Mont. 164, 169, 819 P.2d 152, 155 (citation omitted). Here, the District Court terminated Eric's parental rights under § 41-3-609(1)(e), MCA (1997), which authorizes termination where a child is an adjudicated youth in need of care and the court finds that

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

¶25.Eric asserts that his third treatment plan was not appropriate for his needs and that the District Court erred in finding it "was appropriate for the needs of this family." As a result, according to Eric, his failure to comply with this treatment plan cannot properly be the basis for termination of his parental rights. He requests a remand for a new treatment plan appropriate for his needs.

¶26. We have not specifically defined what constitutes an "appropriate" treatment plan because no bright line definition is possible in light of the unique circumstances of each case. *Custody and Parental Rights of M.M.* (1995), 271 Mont. 52, 56, 894 P.2d 298, 301 (citations omitted). Factors we routinely consider, however, are whether the parent was represented by counsel and stipulated to the treatment plan. *Custody of M.M.*, 271 Mont. at 57, 894 P.2d at 301; *see also Matter of R.H.*, 250 Mont. at 169, 819 P.2d at 155; *In re J.N.*, 1999 MT 64, ¶ 16, 293 Mont. 524, ¶ 16, 977 P.2d 317, ¶ 16. Here, Eric was represented by counsel. He did not sign the treatment plan, however, and did not stipulate to its appropriateness.

¶27. We also consider whether or not the treatment plan takes into consideration the particular problems facing both the parent and the child. *Custody of M.M.*, 271 Mont. at 57, 894 P.2d at 301; *see also In re J.N.*, ¶ 16. Eric challenges certain requirements in his third treatment plan as inappropriate for him under the circumstances of this case.

¶28. Eric's third treatment plan required him to attend weekly individualized therapy focusing on issues of parenting and domestic violence. Eric contends that, because therapy was not recommended as a result of his psychological evaluation, it was inappropriate for DPHHS to require him to attend therapy. We disagree.

¶29. All of Eric's treatment plans focused on providing a safe, nurturing environment for the children and developing minimally adequate parenting skills. Eric's first two treatment plans required Eric to obtain a psychological evaluation, follow the resulting recommendations and attend parenting classes. Eric completed these requirements. However, the results of the Child Abuse Potential Inventory, included in his psychological evaluation, indicated "defensiveness to the extent that the results are considered invalid." The medical evidence indicated that A.N. had been seriously injured by repetitive nonaccidental trauma, and there was no indication those injuries occurred outside the home. In addition, Buxbaum testified that Eric failed to use the information or implement the skills learned in the parenting classes during his visits with C.N. As a result, Eric continued to fail to demonstrate minimally adequate parenting skills, and an attempt to address the potential for violence in the home and to develop minimally adequate parenting skills through another method was necessary. We conclude, therefore, that individualized therapy focusing on the issues of parenting and domestic violence is an appropriate treatment plan requirement for Eric in this case.

¶30. Eric also contends that the third treatment plan's requirements that he explain the

cause of A.N.'s injuries, assume responsibility for any injuries inflicted on A.N., and cooperate with law enforcement to resolve the related criminal charges against him are inappropriate. According to Eric, those requirements violate his Fifth Amendment right against self-incrimination because criminal charges were pending against him for felony assault and felony assault by accountability related to A.N.'s injuries.

¶31.As a threshold matter, DPHHS contends that Eric did not raise the Fifth Amendment issue prior to the termination hearing and should not be allowed to raise it here. We disagree.

¶32.The record reflects--and DPHHS' contention totally concedes--that the Fifth Amendment issue was raised at the termination hearing. In addition, the District Court addressed the issue. Thus, while we generally do not consider an issue presented for the first time on appeal because "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider" (*see Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15 (citation omitted)), the Fifth Amendment issue is not presented for the first time on appeal. Moreover, given Eric's refusal to sign the third treatment plan and DPHHS' duty to prove the appropriateness of a treatment plan (*see Matter of R.H.*, 250 Mont. at 169, 819 P.2d at 155), we conclude that the issue is properly before us.

¶33.The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." It protects an individual from involuntarily being called to testify against himself or herself in criminal proceedings and also creates a privilege for the individual to avoid answering official questions in other proceedings, whether civil or criminal, formal or informal, if the answers might incriminate the individual in future criminal proceedings. *Lefkowitz v. Turley* (1973), 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281. Such testimony may be compelled, however, if the individual is given immunity for the incriminating testimony and the fruits of that testimony. *Lefkowitz*, 414 U.S. at 85, 94 S.Ct. at 326, 38 L. Ed.2d at 286.

¶34.We considered the Fifth Amendment in the termination of parental rights context in *Matter of C.L.R.* (1984), 211 Mont. 381, 685 P.2d 926. There, C.L.R.'s father was incarcerated at the time of C.L.R.'s birth, and subsequently convicted for the deliberate homicide of C.L.R.'s half-brother and sentenced to prison. *Matter of C.L.R.*, 211 Mont. at 382, 685 P.2d at 927. The state petitioned for temporary custody of C.L.R. and C.L.R.'s

father moved for a stay of the proceedings on the basis that, if he testified at the custody hearing, he would jeopardize his Fifth Amendment right. *Matter of C.L.R.*, 211 Mont. at 386, 685 P.2d at 928. The criminal proceedings against C.L.R.'s father were not finally resolved at the time of the proceedings for the termination of his parental rights and, indeed, the two proceedings occurred on parallel time tracks as evidenced by our opinions in *State v. Sigler* (1984), 210 Mont. 248, 250, 688 P.2d 749, 750, decided June 4, 1984, and *Matter of C.L.R.*, 211 Mont. at 387, 685 P.2d at 929, decided July 31, 1984. The district court denied the father's motion for a stay, held the hearing and terminated the father's parental rights. C.L.R.'s father appealed. *Matter of C.L.R.*, 211 Mont. at 383, 385, 685 P.2d at 927-28.

¶35.We recognized on appeal that the "key to [deciding whether a violation of the Fifth Amendment has occurred] rests with determining if appellant is compelled to testify or merely required to make tactical decisions regarding the defense of his position." *Matter of C.L.R.*, 211 Mont. at 386, 685 P.2d at 929. We also observed that the cases on which the father relied involved instances where the failure to testify would result in certain substantial loss. *Matter of C.L.R.*, 211 Mont. at 386-87, 685 P.2d at 929. We determined that C.L.R.'s father could remain silent in the termination proceeding if he so desired, without fear of certain penalty for not testifying. In doing so, we relied in part on the resolution of a "similar issue" in *Matter of Roman* (N.Y. Fam. Ct. 1978), 405 N.Y.S.2d 899, where the New York Family Court determined that the decision whether to testify in the defense of a position is a tactical decision when a defense "'may be established by alternative methods which do not require the Respondent's testimony.'" *Matter of C.L.R.*, 211 Mont. at 387, 685 P.2d at 929 (quoting *Matter of Roman*, 405 N.Y.S.2d at 904). On that basis, we held the trial court acted properly in not staying the termination of parental rights proceedings until the father's criminal proceedings were resolved. *Matter of C.L.R.*, 211 Mont. at 387, 685 P.2d at 929. *Matter of C.L.R.* is readily distinguishable from the present case.

¶36.Here, Eric faced more than a mere tactical decision about whether to affirmatively defend against DPHHS' proof with regard to termination of his parental rights. DPHHS used the third treatment plan to make an official inquiry into A.N.'s injuries, requiring Eric to affirmatively explain the cause of A.N.'s injuries, assume responsibility for any injuries inflicted on A.N., and cooperate with law enforcement to resolve the related criminal charges against him. The successful completion of the treatment plan would help protect Eric's parental rights and could result in the reunification of his family, while the failure to successfully complete the treatment plan would result in the substantial likelihood of

termination of his parental rights. *See* § 41-3-609(1)(e)(i), MCA (1997). Thus, unlike in *Matter of C.L.R.*, Eric was faced with the Hobson's choice of either successfully completing the requirements of his third treatment plan, thereby incriminating himself in the criminal proceeding, or refusing to complete the treatment plan, with the substantially certain penalty of having his parental rights terminated.

¶37. In addition, Eric's situation is more analogous to the defendant's situation in *State v. Fuller* (1996), 276 Mont. 155, 915 P.2d 809, than to that in *Matter of C.L.R.* There, Fuller's criminal sentence had been suspended on the condition that he participate in an outpatient sex offender treatment program which required him to disclose his offense history. *Fuller*, 276 Mont. at 158, 915 P.2d at 811. We observed that Fuller had only two choices: disclose or go to prison. *Fuller*, 276 Mont. at 165, 915 P.2d at 815. On that basis, we held Fuller's Fifth Amendment right was violated when the statements regarding past criminal acts he was required to make as part of a sex offender treatment program were used to convict him of additional offenses. *Fuller*, 276 Mont. at 167, 915 P.2d at 816. Eric's choice is similar: disclose his involvement in A.N.'s injuries and incriminate himself in the criminal proceeding or face certain termination of his parental rights.

¶38. We conclude that the requirements in Eric's third treatment plan relating to A.N.'s injuries forced him to choose between his Fifth Amendment right against self-incrimination and his parental rights. We further conclude that, while Eric was privileged to avoid completing these requirements under *Lefkowitz*, the requirements were not appropriate for inclusion in Eric's third treatment plan.

¶39. It is well established, however, that "no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless." *See Newbauer v. Hinebauch*, 1998 MT 115, ¶ 20, 288 Mont. 482, ¶ 20, 958 P.2d 705, ¶ 20 (citation omitted). Thus, we must determine whether inclusion of the inappropriate requirements relating to A.N.'s injuries in Eric's third treatment plan was reversible error.

¶40. It is not disputed that both Eric and Diana had three treatment plans. In that regard, the District Court found:

. . . . The goals of these treatment plans were to enable the parents to develop skills so that they could provide a safe, nurturing environment for their children, to stabilize them and their environment so that they could parent these children, to develop an awareness of the

childrens' [sic] needs and an ability to meet those needs, to develop minimally adequate parenting skills, and to resolve the issues that led to the abuse of [A.N.]. None of these goals were [sic] successfully met. The tasks required of the parents by the treatment plan that were not done included regular meetings with the social worker, regular visits with the children, individual therapy, and resolution of the issues that led to the abuse of [A.N.]. The parents had no known intellectual deficiencies or defects, and there is no reason they could not have fulfilled these requirements. Further, the social workers were available to make resource referrals, provide counseling and visits, assist in ICPC procedures, and offer services. All available services were offered to these parents. The parents chose not to access these services.

¶41.The requirements we concluded were inappropriate for inclusion in Eric's third treatment plan impacted only one goal of the five goals the District Court found were not successfully met and one task of the four the court found were not completed. On this record, we cannot conclude that inclusion of the inappropriate requirements in Eric's third treatment plan significantly impacted on the District Court's decision or resulted in substantial injustice. *See Newbauer*, ¶ 20. We conclude, therefore, that inclusion of the inappropriate requirements is harmless error in this case.

## ¶42**. Is the District Court's finding of fact that Eric failed to comply with the treatment plans clearly erroneous?**

¶43.Excising the improperly included requirements relating to A.N.'s injuries from both Eric's third treatment plan and the District Court's findings, the court found that Eric failed to comply with the treatment plans' requirements that he meet regularly with the social workers, visit regularly with the children, and obtain individual therapy. The court also found that none of the goals of Eric's treatment plans was successfully met. Eric asserts error.

¶44.Eric's primary contention is that the court's finding that he failed to comply with his treatment plans is clearly erroneous because he substantially complied with his first two treatment plans. He asserts that he did comply with a number of the requirements of his first two treatment plans and that, because Weischedel testified she considered the major failures of his treatment plans to be his lack of cooperation in resolving the issues leading to the abuse of A.N. and his failure to attend therapy, any noncompliance with any of the requirements of the first two treatment plans was insubstantial. In this regard, he concedes there was a period of no visitation, but urges that the conditions on the visitation were

unacceptable to him and, in any event, the period of no visitation did not constitute substantial noncompliance.

¶45.Eric's contention ignores the long-standing principle that partial compliance with a treatment plan is insufficient. *Matter of J.J.C.H.* (1992), 252 Mont. 158, 164, 827 P.2d 812, 816 (citation omitted). Section 41-3-609(1)(e)(i), MCA (1997), permits a court to terminate parental rights if "an appropriate treatment plan . . . has not been complied with . . . ." As the record demonstrates and Eric concedes, Eric failed to visit his children as scheduled and pursuant to the conditions set by Buxbaum. It is irrelevant that he did not agree with the conditions placed on visitation. The treatment plans required him to comply with those conditions and his partial compliance, on his terms, is an insufficient basis on which to premise error in the District Court's finding that Eric failed to comply with his treatment plans. *See Matter of J.J.C.H.*, 252 Mont. at 164, 827 P.2d at 816 (citation omitted).

¶46.Having rejected Eric's substantial compliance contention, we observe that he concedes he did not visit the children as required and as the District Court found. Moreover, the record is clear--and Eric does not dispute--that Eric totally failed to comply with the requirement of his third treatment plan that he obtain individual therapy, a failure Weischedel considered major. Finally, Eric does not contend that insufficient evidence supports the District Court's finding that he failed to meet regularly with the social workers as required by the treatment plans.

¶47.On this record, we hold that the District Court's finding that Eric failed to comply with the treatment plans is supported by substantial evidence and is not otherwise erroneous.

¶48.**. Did the District Court commit reversible error by admitting hearsay?**

¶49.The District Court found, as required for termination of parental rights under § 41-3-609(1)(e)(ii), MCA (1997), that the conduct or condition rendering Eric and Diana unfit to parent their children was not likely to change within a reasonable time. In making that determination, it relied on the following factors set forth in § 41-3-609(2), MCA (1997):

(a) a history of violent behavior by the parent;

(b) a single incident of life-threatening or gravely disabling injury to or disfigurement of a child caused by the parent;. . .

(c) the injury or death of a child because of proven abuse or neglect[.]

¶50.Eric and Diana contend the District Court's reliance on §§ 41-3-609(2)(b), (c) and (f), MCA (1997), necessarily was based on hearsay testimony of C.N. improperly admitted over their objections. They argue that the testimony prejudiced them and, as a result, they are entitled to a new hearing.

¶51.A number of witnesses, including law enforcement personnel, social workers, C.N.'s foster mother, Dr. Johnson and a psychologist who evaluated C.N., testified to statements and demonstrations made by C.N. The witnesses attributed to C.N. statements that Eric played rough or mean with A.N. and grabbed him hard. They also testified that C.N. responded to questions during interviews with demonstrations of an incident in which C.N. was in the bathroom with Diana when Eric hit A.N.'s head against the bathroom door.

¶52.The District Court allowed each witness to testify to C.N.'s statements or demonstrations over Eric and Diana's hearsay objections and requested briefs on the issue. After the briefs were submitted, the court determined that it was "going to take the testimony at this time as if this hearsay is admissible. If it ultimately turns out to be that it is going--ruled not admissible by the Court, it will be easy enough to strike that from the Court's consideration of the petition." The court did not expressly rule on the admissibility issue thereafter and, given its earlier determination, we must assume the challenged testimony was admitted.

¶53.Hearsay is a statement, including both oral assertions and nonverbal conduct intended as an assertion, made by a person not currently testifying and offered in evidence to prove the truth of the matter asserted. Rules 801(a) and (c), M.R.Evid. C.N.'s statements that Eric played rough with A.N. and grabbed him hard are oral assertions. Her demonstrations, using a toy to show how Eric hit A.N.'s head against the bathroom door, are nonverbal conduct; moreover, because the demonstrations were C.N.'s response to questions, they were intended as assertions. C.N. did not testify at the hearing and, according to DPHHS, the statements were "introduced for what the child saw" or, in other words, for the truth of the matter asserted. Therefore, the testimony regarding C.N.'s statements clearly falls within the Rule 801 definition of hearsay.

¶54.Hearsay generally is inadmissible. Rule 802, M.R.Evid. DPHHS advances no rationale or authority under which the bulk of the hearsay testimony was admissible and, as a result, we conclude that the District Court abused its discretion in admitting the

testimony.

¶55. An abuse of discretion in an evidentiary ruling does not necessarily constitute reversible error, however. "Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected." Rule 103(a), M.R.Evid. In other words, "a reversal cannot be predicated upon an error in admission of evidence, where the evidence in question was not of such character to have affected the result." *Lauman v. Lee* (1981), 192 Mont. 84, 90, 626 P.2d 830, 834; *see also Inquiry into M.M.*, 274 Mont. at 169, 906 P.2d at 677; *Mason v. Ditzel* (1992), 255 Mont. 364, 371, 842 P.2d 707, 712. Therefore, we must determine whether the improper admission of hearsay testimony constitutes reversible error in this case.

¶56. Eric and Diana concede that the District Court did not enter any findings relating to, or relying on, the hearsay testimony. They argue, however, that the hearsay testimony provided the only basis for the court's reliance on the factors set forth in §§ 41-3-609(2) (b), (c) and (f), MCA (1997), in determining that the conduct or condition rendering them unfit was unlikely to change within a reasonable time.

¶57. We focus first on whether the District Court's determination that A.N. was injured "because of proven abuse or neglect" under § 41-3-609(2)(f), MCA (1997), necessarily relied on the improperly admitted hearsay testimony. Section 41-3-102(6)(a)(i), MCA (1997), defines child abuse or neglect as "harm to a child's health or welfare[.]" Harm to a child's health or welfare occurs whenever a parent "inflicts or allows to be inflicted upon the child physical or emotional abuse" or "exposes or allows the child to be exposed to an unreasonable risk to the child's health or welfare by failing to intervene or eliminate the risk[.]" Sections 41-3-102(9)(a) and (e), MCA (1997). Under these statutory definitions, the § 41-3-609(2)(f), MCA (1997), "proven abuse or neglect" factor clearly does not require proof that the parent directly inflicted physical injury on a child.

¶58. The record before us contains no direct evidence that either Eric or Diana inflicted injuries on A.N. except for C.N.'s hearsay testimony. The record reflects, however, that A. N. suffered abdominal injuries and repeatedly suffered broken bones while in Eric and Diana's care and custody. In addition, the court found--and Eric and Diana do not dispute-- that all of these injuries were nonaccidental and that the abdominal injuries were life-threatening. The record also reflects that neither Eric nor Diana provided any explanation for A.N.'s injuries or sought medical care for A.N.'s broken bones or life-threatening injuries.

¶59.On this record, the evidence is indisputable that Eric and Diana allowed physical abuse to be inflicted on A.N. and allowed him to be exposed to an unreasonable risk to his health or welfare by failing to intervene or eliminate the risk. These acts or omissions to act constitute harm to a child's health or welfare under §§ 41-3-102(9)(a) and (e), MCA (1997). That harm, in turn, is child abuse or neglect pursuant to § 41-3-102(6)(a)(i), MCA (1997).

¶60.We hold that the District Court properly determined that A.N.'s injuries occurred because of proven abuse or neglect under § 41-3-609(2)(f), MCA (1997), and properly relied on that statutory factor in determining that the conduct or condition rendering Eric and Diana unfit to parent their children was not likely to change within a reasonable time. The improperly admitted hearsay was not necessary to the court's determination and, as a result, it affected neither Eric and Diana's substantial rights nor the result the court reached. Moreover, because the District Court properly relied on § 41-3-609(2)(f), MCA (1997), we need not address its reliance on the factors set forth in §§ 41-3-609(2)(b) and (c), MCA (1997). We hold that, while the District Court abused its discretion in admitting hearsay testimony, the error is harmless.

¶61.Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER